# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ROBERT STEIN, | ) |
| Plaintiff, | ) |
| | ) No. 04 C 6968 |
| v. | ) |
| | ) |
| GAREN & ASSOCIATES ERISA PLAN | ) |
| | ) Magistrate Judge Mason |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

This matter is before the Court on cross motions for summary judgment filed by plaintiff Robert Stein ("plaintiff" or "Stein") and defendant Garen & Associates Erisa Plan ("defendant" or "the Plan"). For the reasons set forth below, defendant's motion for summary judgment is granted and plaintiff's motion for summary judgment is denied.

**Background**[1]

Stein was the sole shareholder and President of Garen & Associates (later Stein Garen and Associates), a tax consulting and accounting firm located in Skokie, Illinois. Stein ceased working at the firm on July 12, 2002 due to multiple sclerosis. Garen & Associates established the Plan in order to provide long term disability insurance coverage to its employees, pursuant to the terms of a group disability insurance policy

---

[1] The facts in this section are derived from the parties' Rule 56.1 statements of facts and the parties' joint summary judgment appendix.

("Group Policy") issued by Unum Life Insurance Company of America ("Unum") to Garen & Associates in June 1990. The Group Policy was issued with a retroactive effective date of January 1, 1990.

Patricia Lee, a Unum employee, faxed a letter to Stein dated April 11, 1990 stating as follows:

> I have faxed the material showing you how we handle income from a K-1 in determining LTD benefits.
>
> For the past, since you did not file your taxes this way, we need a letter from you stating what your ordinary income would have been for the past 2-3 years so we could use this in our calculations should you become disabled prior to the filing of next year's tax return.

On April 16, 1990, Stein provided Ms. Lee, at Unum's Chicago, Illinois office, with a letter stating as follows:

> Factoring out amortization from my Financial Statements, (amortization is an intangible non cash expense), my cash flow for the years 1987, 1988, and 1989 are as follows:
>
> 1987: $118,435.00
> 1988: $107,076.00
> 1989: $99,937.00
>
> These amounts are net of rents received.

The Group Policy contains the following provision for calculating a Plan participant's monthly disability benefit:

> MONTHLY BENEFIT
> To figure the amount of monthly benefit:
>  1. Take the lesser of:
>     a. 60% of the insured's basic monthly earnings; or
>     b. the amount of the maximum monthly benefit shown in the policy specifications; and
>  2. Deduct other income benefits, shown below, from this amount.

The Group Policy's provision for "other income benefits" provides for a deduction of the amount of disability benefits received under the Social Security Act. The Group Policy specifications also provide for a maximum monthly benefit in the amount of $5,000.00. The Group Policy contains the following definition of Basic Monthly Earnings ("BME"):

> Definition of Basic Monthly Earnings
>
> For Owner/Employee(s)
> "Basic monthly earnings" means the insured's average monthly salary in effect just prior to the date disability begins. It also includes earnings from schedule K-1 of the federal income tax return.
>
> Monthly salary will be averaged for:
> a. the 12 month period of employment; or
> b. if employed for less than 12 months, the period of employment; and
> K-1 income will be averaged over:
> a. the 3 most recent years; or
> b. the period of employment, then divided by 12.
>
> For All Others
> "Basic monthly earnings" means the insured's average monthly earnings as figured:
> a. from the W-2 form (from the box which reflects wages, tips and other compensation excluding bonuses) received from the employer for the calendar year just prior to the date disability begins; or
> b. for the period of employment if no W-2 form was received.

The Group Policy contains the following provision for modifying or amending the policy:

> This policy may be changed in whole or in part. Only an officer or a registrar of the Company [Unum] can approve a change. The approval must be in writing and endorsed on or attached to this policy.

Unum issued an Administrative Letter dated June 26, 1990, effective January 1,

1990, which is part of the Group Policy.[2] The Administrative Letter provides as follows:

> This letter will confirm our willingness to administer the definition of basic monthly earnings for Robert Stein in the following manner: Basic monthly earnings will be an average of the prior three years annual income as outlined in the client's letter to Unum dated 4/16/90. (A copy of which is in the file).
>
> Once the client has established three years of k-1 earnings[,] his BME will be based upon an average of his prior three years k-1 earnings.
>
> All other terms and provisions apply.

On November 19, 2002, Unum received a Disability Claim Claimant's Statement signed by Stein, and an Attending Physician Statement signed by Stein's treating physician, Dr. Daniel Wynn. In evaluating Stein's disability claim, Unum obtained medical records from Stein's treating physician, Dr. Wynn.

Unum also obtained Stein's individual federal and state income tax returns for the years 1999 through 2001 and Garen & Associates' corporate federal income tax returns for the fiscal years ending in 1999 through 2001. The Schedule K-1 form for fiscal year 1999 identifies Stein's ordinary income from his 100% ownership of Garen & Associates' stock as $64,856.00. The Schedule K-1 form for fiscal year 2000 identifies Stein's ordinary income from his 100% ownership of Garen & Associates' stock as $43,117.00. The Schedule K-1 form for fiscal year 2001 identifies Stein's ordinary income from his 100% ownership of Garen & Associates' stock as $64,129.00. Stein's personal federal income tax return for 2001 identifies Stein's "wages, salaries, tips, etc."

---

[2] Stein contests this fact and argues that he has no knowledge of whether or not the letter was "issued." Stein also contends that he never received the Administrative Letter. However, as discussed more fully below, Stein's claims in this regard do not preclude summary judgment.

as $6,400.00.

On February 11, 2003, Unum consulted a certified public accountant, Mark Mathy, CPA, who evaluated Stein's individual and corporate income tax returns for the years 1999 through 2001, as well as Garen & Associates' corporate Operating Statements submitted by Stein. Mr. Mathy calculated Stein's BME pursuant to the BME Calculation Worksheet, as follows:

| | | |
|---|---|---|
| 1999 K-1 income | | $64,856.00 |
| 2000 K-1 income | | $23,283.00[3] |
| 2001 K-1 income | | $62,921.00 |
| Average K-1 income | = | $50,353.33 |
| 2001 Salary | + | $6,400.00 |
| | | x 1/12 (for monthly earnings) |
| Basic Monthly Earnings | = | $4,729.44 |
| Monthly Disability Benefit | = | $2,837.66 (60% of BME) |

By letter dated February 12, 2003, Unum approved Stein's claim for disability benefits, and informed him that benefits would be paid monthly in the amount of $2,837.66 (60% of BME). Unum further informed Stein that no benefits are payable during the 90-day elimination period, which extended from July 12, 2002 to October 9, 2002.

On February 27, 2003, Mr. Mathy opined, based on his evaluation of Garen & Associates' Operating Statements and in light of Stein's individual federal income tax returns and Schedule K-1 filings, as follows:

> It appears the insured reported more expenses on the tax returns than on the P&L statements. Expenses such as "Marketing," "Equipment rental," and "Insurance" were those with the most variance.

---

[3] The 2000 and 2001 K-1 income reflects ordinary income less Section 179 expense deductions. The 1999 tax return does not reflect any Section 179 expense deduction.

5

For instance, Garen & Associates' Operating Statement for the fiscal year ending on December 31, 2001 identifies the company's marketing expense as $0.91. Stein claimed a corporate marketing expense deduction in the amount of $21,321.00 on his Schedule K-1 for 2001. Garen & Associates' Operating Statement for the fiscal year ending on December 31, 2001 identifies the company's insurance expense as $31,792.60. Stein claimed a corporate insurance expense deduction in the amount of $36,993.00 on his Schedule K-1 for 2001. Garen & Associates' Operating Statement for the fiscal year ending on December 31, 2000 identifies the company's insurance expense as $28,959.81. Stein claimed a corporate insurance expense deduction in the amount of $35,160.00 on his Schedule K-1 for 2000. The Operating Statement for the fiscal year ending on December 31, 2000 identifies the company's marketing expense as $992.55. Stein claimed a corporate marketing expense deduction in the amount of $3,950.00 on his Schedule K-1 for 2000.

On August 11, 2003, Stein appealed Unum's determination with respect to the calculation of his monthly disability benefit. Stein states, in his August 11, 2003 letter, as follows:

> In 1983 I purchased Jerome Garen's accounting practice. Basically, for tax purposes, it is a sole proprietorship operating as an S corporation. The transaction was tax advantaged for both Jerry Garen and myself. The goodwill was amortized, yielding non taxable cash flow for myself. Jerry Garen benefited [sic] by paying capital gain rates instead of ordinary income rates. The 1120S K-1 was always less than the cash flow. This is very common when buying professional practice, benefiting [sic] both parties, an Internal Revenue Service present.
>
> Over the years I also purchased Ken Garen's (son) practice

6

> adding more amortization. Eventually, as the amortization began to expire, I was aggressive in taking tax deductions which the law allowed, for which I could show reasonable cause: Insurance, business travel, business vacations, equipment leasing, vehicle rental, various entertainment and sales expenses. This never impacted my cash flow.

Stein further states, in his August 11, 2003 letter:

> In 1989 I approached Steve Foreman [of broker ProSource Financial] to procure a disability policy for STEIN GAREN & ASSOCIATES as an employee benefit. I told Steve I would not meet the standard W-2 or K-1 tests for income. Instead, it had to be based on my cash flow, as my tax situation was tax advantaged due to amortization and other factors. He researched for me and came up with UNUM who he said was big enough and flexible to do this. Pattee Lee [sic], I believe she was the UNUM representative, proposed my situation to UNUM, and it was accepted. The decision was that I write an annual letter indicating what my cash flow was for the previous three years. The actual wording was prepared by UNUM and dictated to me by Pattee Lee. She also told me who to address and mail it to.

On September 12, 2003, Unum received a letter from Steven Foreman of ProSource Financial. With the letter, Mr. Foreman enclosed: Garen & Associates' group insurance premium invoices for certain months during the years 1990 to 2003; annual letters from Stein addressed to Unum offices in Portland, Maine dated between 1991 and 2001 stating Stein's prior three years' "cash flow" earnings; and the June 26, 1990 Administrative Letter. Mr. Foreman's letter states:

> Mr. Robert Stein recently went out on disability. He is upset with the amount that he is receiving from Unum/Provident. He has been sending in a letter every year (see attached copies) showing his income. He has been doing this because of an agreement made with our then group representative, Pattee Lee [sic]. A copy of the agreement is also attached.
>
> Stein Garen & Associates has been paying premiums for the past 13 years based on Mr. Stein being at the maximum of

7

> $100,000. We have enclosed copies of invoices for what he
> paid in January each year of the policy. Please review all this
> information and reconsider the amount of benefit for this very
> important client of mine.

With respect to the calculation of premiums, the documents contained in the underwriting file reflect that Garen & Associates established the Plan on a "self-accounting" basis. The premiums due, as reflected in Garen & Associates' group insurance premium invoices for the years 1991 through 2003, were calculated by Garen & Associates based on the amount of employee covered earnings as determined by Garen & Associates. Stein signed and certified as correct his calculation of Garen & Associates' premiums, and acknowledged that Garen & Associates is responsible for any errors in premiums, as follows:

> I certify that the above figures are correct and show changes
> in accordance with the group contract. I acknowledge the
> policyholder's responsibility for any errors.
>
> Bob Stein [signature]

By letter dated October 10, 2003, Unum informed Stein of its decision to uphold its monthly disability benefit calculation on appeal. In the October 10, 2003 letter, Unum states as follows:

> Based on our review of the correspondence regarding this
> issue, we find Unum did not agree to accept reported cash flow
> income for the life of your policy as a basis for calculating your
> monthly income should you become disabled. We find Unum
> communicated directly and specifically of its intention to adhere
> to calculations using K-1's as the basis for calculating monthly
> disability benefits as provided by the policy. The only
> exception Unum made was to accept cash flow income for the
> first 3 years from the policy effective date in the event you
> became disabled in 1991.

Unum re-sent the appellate determination letter to Stein on January 19, 2004,

8

upon learning that Stein had changed his address.

On November 3, 2003, Stein wrote a letter to Unum stating: "[T]he policy was initially established using cash flows and was to continue that way in order to protect my cash flow. The K-1's were never part of the equation." Stein also states that Unum calculated his BME using only his Schedule K-1 filings and "ignored" his W-2 forms. By letter dated January 13, 2004, Unum acknowledged receipt of Stein's November 3, 2003 letter, and advised Stein that it would "review this matter further with our underwriting department."

On February 2, 2004, Unum informed Stein of its decision to uphold its calculation of monthly disability benefits on appeal, based on its evaluation of the underwriting file and the administrative record. In the letter, Unum states: "[o]ur evaluation has not found any open ended agreement to accept cash flow earnings instead of K-1 earnings."

On February 10, 2004, Unum's Lead Appeals Specialist, Jeanne Callaway, spoke with Stein by telephone, at which time Stein advised her that "he should have gotten the agreement in writing." Ms. Callaway's memorandum memorializing the conversation further notes the following: "He does not want any refund in premiums [sic] that would be stupid."

On July 15, 2004, Unum received a letter (dated June 14, 2004) from Stein's attorney, Steven Jambois of Kralovec, Jambois & Schwartz, asserting that Unum had agreed, in 1990, to determine Stein's BME according to his "annual cash flow earnings" and not according to his Schedule K-1 income. Mr. Jambois further states that Unum calculated Stein's BME based solely on his Schedule K-1 income and failed to include

9

Stein's W-2 salary. As stated by Mr. Jambois:

> [T]he Group LTD plan defines BME as the insured's average monthly salary (which would include Mr. Stein's W-2 salary) and also earnings from schedule K-1. Your determination as to Mr. Stein's disability benefits, however, are based solely on his K-1s.

In a July 28, 2004 letter to Mr. Jambois, Unum explained its calculation of Stein's monthly disability benefit as follows:

> Mr. Stein's BME (basic monthly benefit) was calculated using the following information:
>
> 1999 K1 earnings $64,856.00
> 2000 K1 earnings $23,283.00
> 2001 K1 earnings $62,921.00
>
> The average of the above three K1 earnings equal $50,353.33. The salary reported in the 2001 W2 was $6,400.00. Thus, the calculations were based on the three month K1 average of $50,353.33 plus W2 earnings of $6,400.00 to equal $56,753.33. $56,753.33 [divided by] 12 = $4729.00. Thus, as the plan provides, we pay 60% of the BME which is the $2,837.66 monthly benefit Mr. Stein is receiving. Thus, the monthly benefit Mr. Stein is receiving does consider W2 earnings.

Stein exhausted his administrative remedies on July 28, 2004. He filed this action in the Circuit Court of Cook County on September 22, 2004. The matter was removed to the Northern District of Illinois on October 29, 2004.

**Analysis**

Summary judgment is appropriate where the record and affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The court must "construe all facts

in the light most favorable to the nonmoving party and draw all reasonable and justifiable inferences in favor of that party." *King v. Preferred Tech. Group*, 166 F.3d 887, 890 (7th Cir. 1999). Because both parties' motions address the same claims and evidence, we will first consider the defendant's motion, construing the facts in the light most favorable to Stein.

**Standard of Review**

Judicial review of a plan administrator's determination of benefits is de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 103 L. Ed. 2d 80, 109 S. Ct. 948 (1989). See also, *Militello v. Central States, Southeast and Southwest Areas Pension Fund*, 360 F.3d 681, 685 (7th Cir.2004). Where the plan grants discretionary authority to the administrator, the court reviews a denial of benefits under the arbitrary and capricious standard. *Militello*, 360 F.3d at 685. Accordingly, under ERISA, "the standard of review depends on the amount of discretion that plan documents afford the plan administrator." *Id.*

There is no dispute that the de novo standard of review is applicable here because the Group Policy does not contain the requisite discretionary language. Under the de novo standard of review, this Court must determine whether the plan administrator made the correct decision in calculating Stein's monthly benefits. *Wilczynski v. Kemper National Insurance Cos.*, 178 F.3d 933, 935 (7th Cir. 1999); *Akhtar v. Cont'l Cas. Co.*, 2002 U.S. Dist. LEXIS 5393, *11 (N.D. Ill. 2002) (recognizing that under a de novo review, the court looks beyond whether the administrator's

11

decision was reasonable and determines whether it was correct), citing *Postma v. Paul Revere Life Ins. Co.*, 223 F.3d 533, 540 (7th Cir. 2000).

**The Plan Administrator Correctly Calculated Stein's Monthly Benefits**

In November 2002, Stein filed a claim for disability with Unum. Based on Stein's W-2 forms and K-1 filings, the plan administrator, Unum, approved the payment of monthly disability benefits in the amount of $2,837.66. The parties do not dispute that Stein is entitled to benefits under the Group Policy. Rather, Stein disputes the amount of his monthly benefits.

Defendant argues that Stein's monthly disability benefits were calculated in accordance with the Group Policy and the Administrative Letter. According to the Group Policy, a plan participant is entitled to the lesser of the maximum monthly benefit ($5,000.00) or 60% of the participant's basic monthly earnings (or "BME"). BME for an owner/employee consists of the participant's average monthly salary in effect just prior to the date disability begins and earnings from schedule K-1 of the federal income tax return. The Group Policy provides that the monthly salary will be averaged for the twelve month period of employment just prior to the disability and K-1 income will be averaged over the most recent three years.

In the June 26, 1990 Administrative Letter, Unum initially agreed to calculate Stein's BME based on an average of the prior three years annual income as outlined in Stein's April 16, 1990 letter. However, the Administrative letter states that once Stein has established three years of K-1 earnings, his BME will be based on an average of his prior three years K-1 earnings. The letter also provides that all other terms and provisions apply. Therefore, after three years (by 1993), Stein's BME would be based

on an average of his prior three years K-1 earnings and his average monthly salary in effect for the twelve month period prior to the date disability begins.

Unum employed a certified public accountant, Mark Mathy, CPA, to compute Stein's monthly disability benefits. Mr. Mathy determined the average of Stein's schedule K-1 income for the three years prior to the date his disability began (1999 through 2001). Mr. Mathy also determined Stein's salary for the year prior to the disability based on Stein's W-2 form for 2001. He added the average K-1 earnings ($50,353.33) to the 2001 W-2 salary ($6,400.00) and divided by 12 to arrive at Stein's basic monthly earnings ($4,729.44). Next, Mr. Mathy calculated Stein's monthly disability benefit based on 60% of Stein's BME. Accordingly, Mr. Mathy determined that Stein's monthly disability benefit should be $2,837.66. On February 12, 2003, Unum informed Stein of its decision to approve his claim for disability benefits in the amount of $2,837.66 per month. After reviewing the Group Policy and the Administrative Letter, this Court finds that Unum correctly calculated Stein's monthly disability benefits in accordance with the policy and the letter.

In response to defendant's motion for summary judgment, Stein argues that the Plan was modified but that the undisputed facts reveal an ambiguity in the foundation and terms of the parties' agreement. In particular, Stein contends that the yearly letters he sent to Unum support his version of the parties' agreement, (*i.e.*, that Unum agreed to measure his income based on a yearly report of his "cash flow"). On the other hand, according to Stein, the June 1990 Administrative Letter supports Unum's version of the agreement. Stein contends that he was concerned that his W-2's and K-1's would not accurately reflect his income but that he resolved this issue with Unum's representative,

13

Patricia Lee. Apparently, Stein believes that Unum, through Ms. Lee, accepted his version of the parties' agreement. At the same time, Stein concedes that the documentation in Unum's file does not reflect what he wanted.

Stein fails to acknowledge that the Group Policy sets forth specific requirements for amending the terms of the Plan. Indeed, the Group Policy provides that only an officer or registrar of Unum can approve a change to the policy and that approval of any change must be in writing. Additionally, while written modifications of an ERISA plan are permitted, a plan may be amended only pursuant to its express terms. *Downs v. World Color Press*, 214 F.3d 802, 805 (7th Cir. 2000). Because Stein's yearly letters to Unum were not approved in writing by a Unum officer or registrar, they do not constitute an amendment to the Plan. Furthermore, oral modification of an ERISA plan is prohibited. *Id.* Therefore, the Plan could not be amended pursuant to any oral agreement between Stein and Ms. Lee. Contrary to Stein's suggestion, there is no ambiguity in the terms of the parties' agreement.[4] Rather, the Group Policy and the Administrative Letter clearly set forth the manner in which the plan administrator must calculate a participant's monthly disability benefits.

Next, Stein contends that he never received the Administrative Letter. Stein appears to suggest that the Administrative Letter does not constitute a valid and enforceable amendment because he never received it. However, Stein has waived this argument by failing to develop it and failing to cite any pertinent legal authority. *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) (stating that "perfunctory and

---

[4] Because this Court finds no ambiguity in the terms of the Plan, Stein's *contra proferentem* argument is rejected.

undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived"); *CFTC v. Tokheim*, 153 F.3d 474, 476 n. 3 (7th Cir. 1998); *Canal Barge Co. v. Commonwealth Edison Co.*, 2002 U.S. Dist. LEXIS 9844, *15 (N.D. Ill. 2002).

Stein further argues that he has no knowledge of whether or not the Administrative Letter was "issued" by Unum because he never received it. However, Stein alleged in his complaint that Unum issued a letter dated June 26, 1990. (Cmplt, ¶ 7). He also alleged that when Unum calculated the amount of monthly benefits payable, it used a method that conflicts with the language of the written plan as amended by Unum's letter of 1990. (Cmplt, ¶ 11). Thus, in his complaint, Stein alleges that the Administrative Letter amended the Plan. Stein's attempt to amend his complaint in response to defendant's motion for summary judgment is improper. *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002); *Brosted v. Unum Life Ins. Co. of Am.*, 349 F. Supp. 2d 1088, 1091 (N.D. Ill. 2004). Based on the foregoing, this Court finds that summary judgment is not precluded merely because Stein claims he never received the Administrative Letter and does not know if Unum "issued" it.

Stein also argues that he was justified in assuming that Unum accepted his version of the parties' agreement because Unum never responded to his yearly letters and Unum accepted premiums based on the figures supplied by his letters. The fact that Unum never responded to Stein's yearly letters is unfortunate. However, as stated above, Stein's letters simply do not constitute an amendment to the Plan. With respect to the premiums, Stein acknowledged the fact that he was responsible for errors in calculating the amount of the premiums. Additionally, Stein rejected Unum's offer to refund the overpayment of premiums.

15

Finally, Stein contends that Unum failed to explain why it only used his 2001 W-2 income rather than an average of his W-2 income for the three years prior to the date his disability began. This argument lacks merit because the Group Policy provides that monthly salary will be averaged for the twelve month period of employment just prior to the disability while K-1 income will be averaged over the most recent three years.

In sum, this Court finds that Unum correctly calculated Stein's monthly disability benefits in accordance with the Group Policy and the Administrative Letter. Accordingly, summary judgment in favor of the defendant is warranted.

**Attorneys' Fees and Costs**

Defendant has requested an award of reasonable attorneys' fees and costs. Under ERISA's fee-shifting statute, 29 U.S.C. § 1132(g)(1), the court has discretion to allow reasonable attorneys' fees and costs to either party. Although the Seventh Circuit has articulated two tests for analyzing the propriety of a fee request, *Quinn v. Blue Cross and Blue Shield Ass'n*, 161 F.3d 472, 478 (7th Cir. 1998), both formulas essentially ask the same question, *i.e.*, "was the losing party's position substantially justified and taken in good faith, or was that party simply out to harass its opponent?" *Bowerman v. Wal-Mart Stores, Inc.*, 226 F.3d 574, 593 (7th Cir. 2000). The Seventh Circuit has also stated:

> [B]ecause ERISA's remedial purpose is to protect, rather than penalize participants who seek to enforce their statutory rights, an award of fees to a successful defendant will be denied "if the plaintiff's position was both 'substantially justified' -- meaning something more than nonfrivolous, but something less than meritorious -- and taken in good faith, or if special circumstances make an award unjust."

*Stark v. PPM Am., Inc.*, 354 F.3d 666, 673 (7th Cir. 2004), citing *Senese v. Chicago*

*Area I.B. of T. Pension Fund*, 237 F.3d 819, 826 (7th Cir. 2001). Here, we find that plaintiff's position was both taken in good faith and something more than nonfrivolous. Therefore, defendant's request for attorneys' fees and costs is denied.

**Conclusion**

For the reasons set forth above, this Court finds that Unum correctly calculated Stein's monthly disability benefits in accordance with the Group Policy and the Administrative Letter. Accordingly, defendant's motion for summary judgment is granted and plaintiff's motion for summary judgment is denied. The Clerk of Court is directed to enter judgment in favor of defendant Garen & Associates Erisa Plan and against plaintiff Robert Stein. It is so ordered.

**ENTER:**

_____
**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated:    January 24, 2007**